# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | |
|---|---|
| **PRO-DRIVE OUTBOARDS, LLC** | **CIVIL ACTION NUMBER:** _____ |
| **VERSUS** | **JUDGE** _____ |
| **CRUZANI, INC. F/K/A**<br>**US HIGHLAND, INC., ET AL.** | **MAGISTRATE JUDGE** _____ |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PLAINTIFF'S ORIGINAL COMPLAINT

This action is commenced by Plaintiff, PRO-DRIVE OUTBOARDS, LLC, by its attorneys against Defendants, CRUZANI, INC. F/K/A US HIGHLAND, INC and JOHN R. FITZPATRICK, individually and in his corporate capacity.

## PARTIES

1.    Plaintiff, PRO-DRIVE OUTBOARDS, LLC ("PRO-DRIVE"), is a Louisiana limited liability company domiciled in the Western District in Loreauville in the Parish of Iberia, State of Louisiana.

2.    Defendant, CRUZANI, INC. F/K/A US HIGHLAND, INC. ("HIGHLAND"), is a Nevada corporation, having a place of business at 3500 Lenox Road, Suite 1500, Atlanta, Georgia 30309 and may be served with process by serving its registered agent for service of process, Capitol Corporate Services, Inc. at 202 South Minnesota Street, Carson City, Nevada 89703.

3.    Defendant, John R. Fitzpatrick, III, ("FITZPATRICK") is an Oklahoma resident residing at 8109 South 70th East Place, Tulsa, Oklahoma 74133.

-1-

## JURISDICTION AND VENUE

4.      This action is brought by Plaintiff PRO-DRIVE against Defendant HIGHLAND for breach of contract, detrimental reliance, and bad faith performance to recover damages and the costs of suit, including attorneys' fees, caused by the actions of Defendant HIGHLAND, whose actions constituting this offense occurred in the Western District of Louisiana, and the damages resulting therefrom occurred and had effect in the Western District of Louisiana.

5.      This action is brought by Plaintiff PRO-DRIVE against Defendant FITZPATRICK for detrimental reliance and bad faith performance to recover damages and the costs of suit, including attorneys' fees, caused by the actions of Defendant FITZPATRICK, whose actions constituting this offense occurred in the Western District of Louisiana, and the damages resulting therefrom occurred and had effect in the Western District of Louisiana.

6.      Jurisdiction over these state law claims is based upon diversity of citizenship under 28 U.S.C. § 1332.  The amount in controversy exceeds the $75,000.00 jurisdictional amount.

7.      Venue is appropriate within this district under 28 U.S.C. § 1391, in that all or a substantial part of the acts charged in this complaint were carried out within this district, in that Defendant HIGHLAND transacted business within this district, and in that Defendant FITZPATRICK transacts business within this district.

8.      Defendants are amenable to the *in personam* jurisdiction of this Court.

## BACKGROUND FACTS

9.      Plaintiff PRO-DRIVE is a Louisiana company that was established in 2002 in Iberia Parish.  It is the manufacturer of the first ever shallow water outboard motors built for hunting, fishing, and commercial purposes.  PRO-DRIVE is operated by its managing

member, Brian Provost ("Provost"), who is the inventor of the PRO-DRIVE outboard motors for which multiple United States patents have been granted.

10.     The PRO-DRIVE outboard motors utilize air-cooled engines because air-cooled engines allow the outboard motors to be more efficiently operated and/or less subject to breakdown when the outboard motors are operated in very shallow water and in swampy conditions.

11.     Plaintiff PRO-DRIVE utilizes air-cooled engines supplied by third-party manufacturers.  For some time prior to September 2009, Plaintiff PRO-DRIVE had been searching for an engine produced by a third-party manufacturer that would increase the horsepower capacity of the line of outboard motors offered by Plaintiff PRO-DRIVE.

12.     After researching the engines available, Provost learned that Highland Motorcycles in Sweden had a high horsepower motorcycle engine that might be suitable for use by Plaintiff PRO-DRIVE.

13.     In September 2009, Provost made a telephone call to Highland Motors in Sweden on behalf of Plaintiff PRO-DRIVE and spoke to Mr. Mats Malmberg ("Malmberg").  Provost inquired about purchasing Highland 950cc engines for use on PRO-DRIVE products.  Provost told Malmberg that Plaintiff PRO-DRIVE wanted to convert the 950cc from a horizontal shaft engine to a vertical shaft engine.

14.     Malmberg was a motorcycle racer, motorcycle designer, and the founder of Highland Motorcycles AB in Skallinge, Sweden.  Highland Motorcycles AB produced a motorcycle engine with a 950cc engine.

15.    In the September 2009 conversation with Malmberg, Provost told Malmberg that Plaintiff PRO-DRIVE wanted to convert the 950cc from a horizontal shaft engine to a vertical shaft engine.  Malmberg referred Provost to his U.S. colleague, Chase Bales ("Bales").

16.    Bales was a venture capitalist and a motorcycle enthusiast.

17.    Shortly after his September 2009 call with Malmberg, Provost had a telephone call with Bales.  Bales told Provost that Highland motors was opening a manufacturing plant in Tulsa, Oklahoma and that it would be producing the 950cc engines there.

18.    In his initial conversation with Bales, Provost told Bales that Plaintiff PRO-DRIVE wanted to buy engines in production quantities.  Bales told Provost that HIGHLAND would be in production of engines in quantities of 50,000 units per year and that there would be no problem supplying Plaintiff PRO-DRIVE with 2,000 to 3,000 engines per year.

19.    Bales also stated that the high volume of engines that will be built by HIGHLAND for motorcycles will allow Plaintiff PRO-DRIVE to benefit by being able to obtain engines at a low cost.

20.    Provost then asked Bales to purchase engines from HIGHLAND for prototyping. Bales told Provost that HIGHLAND was also a rapid prototyping company and that it could do the prototype work much faster than Plaintiff PRO-DRIVE.  Bales told Provost that prototyping was "something that you don't want to do."

21.    In September 2009, Provost visited HIGHLAND in Tulsa, Oklahoma on behalf of Plaintiff PRO-DRIVE.  On that visit, Provost brought a production model PRO-DRIVE outboard motor powered by a 27 HP Kohler power head.  Provost also brought drawings of the motor drive and couplings to assist HIGHLAND in prototyping the engine to fit the drive and couplings

-4-

as the Kohler did.  Provost also brought a PRO-DRIVE outboard motor, less the engine, to be used for a prototype outboard with the 950cc engine.

22.     During the September 2009 meetings with HIGHLAND, Provost met with Bales and Damien Riddoch ("Riddoch").  Bales and Riddoch reassured Provost about the discussions that Provost had with Bales during his earlier telephone call with Bales.

23.     During the September 2009 meeting, Provost asked if a small auxiliary hydraulic pump could be driven by the engine to operate a power trim and a power steering system. Riddoch told Provost that he had an idea to install a larger pump that would also run a hydraulic motor that would power the Pro-Drive propeller.  Provost told Riddoch that in his experience with hydraulically driven propellers, there was too much power loss between the engine and propeller through hydraulics.  Riddoch told Provost that he had experience with hydraulic systems that were much more efficient than the ones that Provost had used.

24.     In November 2009, Provost had another telephone call with HIGHLAND.  In that call, Provost asked technical questions relating to the engine design.  Provost also asked questions about the next steps in prototyping the engine.  Provost and HIGHLAND also discussed possible production engine prices.  Provost was told that production prices including the hydraulic system would be down to just over $1,000.00 in high volume; and that at quantities of 700 to 1,000 engines per year, the cost would be $2,500.00 to $3,000.00 per engine.

25.     On November 23, 2009 PRO-DRIVE received an e-mail from Riddoch with a proposal letter.  The proposal was for a prototyping and licensing arrangement between Plaintiff PRO-DRIVE and Defendant HIGHLAND.  The prototyping proposal was for the creation of a platform with the 950cc HIGHLAND engine and a hydraulic system.  The proposal prototyping fee was quoted at $126,000.00 and the licensing fee was quoted at $200,000.00.

26.     In December 2009, Provost visited Defendant HIGHLAND in Tulsa on behalf of Plaintiff PRO-DRIVE, and again met with Riddoch.  During that meeting, Riddoch and Provost discussed the proposed license and the engine production pricing.  Riddoch told Provost that 950cc Highland engines would be sold to Plaintiff PRO-DRIVE at possibly $1,600.00 to $1,800.00 on the low end and $3,200.00 to $3,600.00 on the high end.  Riddoch also said that higher volumes prices could eventually get the price as low as $1,000.00 per engine.

27.     In the December 2009 meeting, Riddoch told Provost that the prototype delivery would be in March 2010.  Riddoch also told Provost that production engine deliveries would begin in the middle to second part of 2010.

28.     On January 6, 2010, Plaintiff PRO-DRIVE received an e-mail from Riddoch with a prototype and license agreement and payment instructions.  The payment instructions were that Plaintiff PRO-DRIVE pay the $126,000.00 prototyping fee plus $50,000.00 of the $200,000.00 license fee that week, followed by three equal payments each month from February through April, for the balance of $326,000.00 total.

29.     Concerned about payment of a license and a prototyping fee up front and before any work was started; Provost e-mailed Riddoch on behalf of Plaintiff PRO-DRIVE with questions regarding Defendant HIGHLAND's ability to timely perform.  Riddoch answered that Defendant HIGHLAND would push hard to have the prototype done in sixty (60) to ninety (90) days and that he anticipated that production engines would be available in six (6) months.

30.     On January 12, 2010, Plaintiff PRO-DRIVE and Defendant HIGHLAND signed an Exclusive Distribution Agreement for Shallow Water Marine Applications ("Distribution Agreement").  In the Distribution Agreement, Defendant HIGHLAND represented itself as an Oklahoma corporation and a subsidiary of Highland Group AB, a Swedish company.

31.     On January 12, 2010, Plaintiff PRO-DRIVE transferred $126,000.00 from its bank account into Defendant HIGHLAND's bank account.  Four payments of $50,000.00 each followed, one each of the following months.

32.     Defendant HIGHLAND was originally chartered as an Oklahoma limited liability company on February 5, 1999 under the name The Powerhouse, L.L.C.; later converting to Harcom Productions, Inc., an Oklahoma corporation, on November 9, 2006; later merging U.S. Highland, Inc., also an Oklahoma corporation, into Harcom Productions, Inc. and subsequently changing the merged entity name to US Highland, Inc. on January 25, 2010; and then re-charting as a Nevada corporation, changing its name to Cruzani, Inc., on June 29, 2018.

33.     During the first quarter of 2010, Provost made numerous calls to Defendant HIGHLAND regarding its activities.

34.     Plaintiff PRO-DRIVE was finally advised by Defendant HIGHLAND that a prototype outboard motor with the 950cc engine with hydraulic pump mounted to a PRO-DRIVE outboard motor drive system ("950cc Prototype") was ready for review.  The 950cc Prototype was a hydraulic drive outboard motor.

35.     Provost traveled to Tulsa in May 2010 to meet with Defendant HIGHLAND and Riddoch.  Provost brought a boat to that meeting so that the 950cc Prototype could be tried.

36.     The 950cc Prototype was bulky with a large oil reservoir mounted on the side of the engine and Provost did not like its look or its size.  Provost was still hopeful that if the 950cc Prototype performed well, then maybe Highland could develop it into a useful production model.

37.     The 950cc Prototype was mounted on the boat provided by Plaintiff PRO-DRIVE and brought to a lake for testing.

38.     The performance of the 950cc Prototype was poor and it consumed a lot of fuel. Defendant HIGHLAND claimed that the 950cc Prototype was 80 HP, but its performance compared more to the 27 HP PRO-DRIVE outboard motor that was already in use by Plaintiff PRO-DRIVE.

39.     Provost asked Defendant HIGHLAND to consider converting the 950cc Prototype to a direct drive outboard motor instead of a hydraulic drive outboard motor.  Provost also asked Defendant HIGHLAND if Plaintiff PRO-DRIVE could get an engine that could be adapted to a PRO-DRIVE drive assembly at Plaintiff PRO-DRIVE's facility in Loreauville, Louisiana. Provost was then told by Riddoch that the next step would be to get another hydraulic pump and/or motor.

40.     Prior to the testing of the 950cc Prototype, telephone calls between Plaintiff PRO-DRIVE and Defendant HIGHLAND were initiated by both parties. After that time, the telephone calls between Plaintiff PRO-DRIVE and Defendant HIGHLAND were mainly initiated by Plaintiff PRO-DRIVE.  Most of these telephone calls were between Provost and Riddoch.  When Riddoch was asked about progress on the prototyping, Riddoch always responded by saying that he was waiting on hydraulic components.

41.     Provost called Defendant HIGHLAND in July 2010 and asked to speak to Riddoch.  Provost was told by the receptionist that Riddoch was not available.  Provost hung up and waited a while.  When Provost called back and asked to speak to Bales, the receptionist told Provost that Bales was not available.

42.     Provost called back again and asked to speak to Bales, Riddoch, or Malmberg. The receptionist then told Provost that Bales, Riddoch, and Malmberg had been killed in a plane crash a few days earlier.  The receptionist then told Provost that Darin Long ("Long") would

return his call shortly and that Long would be handling Riddoch's business with Plaintiff PRO-DRIVE.

43.    Newspaper and online accounts of the airplane crash state that Bales, Riddoch, and Malmberg were killed in an airplane crash on July 10, 2010.  These newspaper and online accounts of the airplane crash identify Malmberg as the president of HIGHLAND, Bales as the COO of HIGHLAND, and Riddoch as the CFO of HIGHLAND.

44.    Long subsequently called Provost and arranged a meeting with Provost for later in July 2010.

45.    During the July 2010 meeting with Long, Provost was introduced to Martin Lind ("Lind").  Provost was told that Lind was in Tulsa from HIGHLAND in Sweden.  The 950cc Prototype was still there.  Both Long and Lind agreed that the hydraulic drive on the 950cc Prototype should be abandoned.

46.    Long and Lind then showed Provost an 1150cc engine, and told him that they now intended to use that 1150cc engine with the PRO-DRIVE outboard motor drive system. Provost agreed to test the 1150cc engine in a horizontal shaft configuration using a 90-degree gearbox that Plaintiff PRO-DRIVE would provide.

47.    Provost had a telephone call with Long in August 2010.  During that August 2010 call, Long told Provost that he did not have the licensing agreement that Plaintiff PRO-DRIVE signed with Defendant HIGHLAND, and requested a copy of said agreement.  Provost then sent an e-mail to Defendant HIGHLAND with a copy of the licensing agreement and the proposal letter that Plaintiff PRO-DRIVE received from Riddoch.

48.    During the August 2010 call, Long also told Provost that an 1150cc horizontal shaft engine, with the 90-degree gearbox provided by Plaintiff PRO-DRIVE, was now mounted

on the PRO-DRIVE outboard motor drive system ("1150cc Prototype").  Long said that Plaintiff

PRO-DRIVE could arrange to test the 1150cc Prototype on a boat.

49.     During the August 2010 call, Long said that the engine used on the 1150cc

Prototype was available for production.  Long also said that the horizontal shaft engine used on

the 1150cc Prototype could be converted to a vertical shaft engine.  Long further said the

conversion would take engineering and some new tooling, and that production of vertical shaft

engines could begin in January 2011.

50.     Plaintiff PRO-DRIVE and Defendant HIGHLAND agreed that the 1150cc engine

had to be converted to a vertical crankshaft engine for use with the PRO-DRIVE.

51.     On September 7, 2010, Provost went to visit Defendant HIGHLAND, and the

1150cc Prototype was tested on a lake near Tulsa.  While the 1150cc Prototype appeared to be a

contraption, its performance seemed to be fine on open water.  There was no place near Tulsa to

test the 1150cc Prototype in swamp or marsh conditions.

52.     Provost asked to take the 1150cc Prototype to Plaintiff PRO-DRIVE's facilities in

Loreauville, Louisiana for further testing.  Lind told Provost that there were problems with other

projects that Defendant HIGHLAND was working on and asked Provost to leave the PRO-

DRIVE outboard motor drive system without the 1150cc engine and some other parts and so that

the Defendant HIGHLAND technicians would have something to work on.  Provost agreed to

that arrangement.  Plaintiff PRO-DRIVE later shipped other parts requested by Defendant

HIGHLAND in order to adapt a second 1150cc engine to a PRO-DRIVE outboard motor drive

system.

53.     Long travelled to Loreauville, Louisiana in September 2010 to meet with Plaintiff

PRO-DRIVE.  At that meeting Long told Provost that more engineering would be needed to

convert the 1150cc engine to a vertical shaft engine.   Long told Provost that Defendant HIGHLAND had a good engineer that specialized in this type of work.

54.     Long then told Provost that the engineering would cost about $20,000.  Long asked Plaintiff PRO-DRIVE to pay the $20,000 upfront so that the work could begin.  Plaintiff PRO-DRIVE gave Long a check for $20,000.00 during the September 2010 visit.

55.     Plaintiff PRO-DRIVE and Provost exhibited the PRO-DRIVE products at a sportsman's show in Tulsa in October 2010.   Provost visited Defendant HIGHLAND at that time and left another boat with Defendant HIGHLAND for use in testing.

56.     Plaintiff PRO-DRIVE had very little communication with anyone from Defendant HIGHLAND after October 2010.

57.     In February 2011, Provost tried to call Defendant HIGHLAND on behalf of Plaintiff PRO-DRIVE but there was no answer.  Provost called Long's cellular phone number. Long told Provost that Defendant HIGHLAND had not been paying rent on the facility that they had been operating in and that Defendant HIGHLAND had been evicted.  Long also told Provost that the boat and trailer that Defendant PRO-DRIVE had left with Defendant HIGHLAND in May 2010 was locked in the building along with all of the other PRO-DRIVE equipment. Plaintiff PRO-DRIVE arranged for Long to retrieve Plaintiff PRO-DRIVE's boat, trailer, and other equipment from the facility where Defendant HIGHLAND was evicted.

58.     Plaintiff PRO-DRIVE asked Long to travel to Loreauville, Louisiana for a meeting, and Long agreed to do so.  Long told Provost that Defendant HIGHLAND had no money for travel and Plaintiff PRO-DRIVE agreed to pay Long's hotel expenses for that meeting.

59.     Long met with Plaintiff PRO-DRIVE in Loreauville, Louisiana in February 2011. Long told Plaintiff PRO-DRIVE that Defendant HIGHLAND was out of business but then advised Plaintiff PRO-DRIVE about Defendant HIGHLAND's plans to get back in business.

60.     Long told Provost that the engineer that was attempting to covert the 1150cc engine to a vertical shaft engine was named Jarid Shawd ("Shawd") of SS Design Labs and that Shawd had the 1150cc engine at his father's business, Area Steel, in South Dakota.

61.     On March 17, 2011, Plaintiff PRO-DRIVE shipped a complete new PRO-DRIVE outboard motor to Shawd to view and work with on engine design.

62.     On April 13, 2011, Provost had a telephone conversation with Defendant FITZPATRICK, the then new CEO for Defendant HIGHLAND.  Defendant FITZPATRICK said that he understood that Plaintiff PRO-DRIVE's target price on the 1150cc engine would be $3,000.00 to $4,000.00 and assured that Plaintiff PRO-DRIVE would have prototypes for testing as soon as possible.

63.     Defendant FITZPATRICK claimed that Defendant HIGHLAND would have production prototypes of the 1150cc engine by the latter part of 2011 and that production would start in the early part of 2012.

64.     On May 1, 2011, Plaintiff PRO-DRIVE visited Defendant HIGHLAND in Tulsa to meet with Defendant FITZPATRICK, the other then new HIGHLAND executives, and engineer Shawd.  At that meeting, Long brought the PRO-DRIVE boat and outboard motor that had been recovered from the eviction premises and delivered it to Shawd for testing in South Dakota.  Shawd also took a PRO-DRIVE outboard motor, less the engine for building another prototype for HIGHLAND.

65.     On May 2, 2011, Provost met with Defendant FITZPATRICK, Ron Brewer (a then new HIGHLAND executive), and Long.  All agreed on a target price on production 1150cc engines of $3,000.00 to $4,000.00.  Provost was told that Defendant HIGHLAND would be production capable by end of 2011.

66.     At the May 2, 2011 meeting, Defendant HIGHLAND offered Plaintiff PRO-DRIVE another option—to get started earlier, Defendant HIGHLAND could order base engines from Folan Engines ("Folan") in Sweden.  Defendant HIGHLAND would build the rest of the parts required to convert the engines to be PRO-DRIVE ready.  Provost was told that Folan was the original designer and builder of the 1150cc engine and that they could build thirty (30) engines per month.  Defendant HIGHLAND said that if Plaintiff PRO-DRIVE would order at that time, it could probably have twenty (20) to thirty (30) complete engines by September or October of 2011.  Defendant FITZPATRICK said that he had modeling being done on the old 1150cc engine and that Shawd was working on the vertical shaft conversion.

67.     At the May 2, 2011 meeting, Long told Provost that the owner of Folan, Lars Nilson ("Nilson"), may sell the complete engine platform with all tooling.  Defendant FITZPATRICK said he would approach Nilson to buy the platform in a month.  At the May 2, 2011 meeting, it was assured that Defendant HIGHLAND should be in production of complete engines in April 2012.

68.     On May 2, 2011, Shawd told Provost that SS Design Labs had never been paid any money to work on converting an 1150cc engine into a vertical shaft engine as of that date.  Plaintiff PRO-DRIVE agreed to pay SS Design Labs to do the conversion and was told that this would cost about $15,000.00.  Shawd also told Provost that SS Design Labs should be ready to

test the vertical shaft prototype and Plaintiff PRO-DRIVE would have the first PRO-DRIVE vertical 1150cc outboard motor ("Vertical Shaft Prototype") by end of May 2011.

69.     From March 2011 to November 2011, Plaintiff PRO-DRIVE provided SS Design Lab with parts and payments to convert the 1150cc engine into a vertical shaft engine.  A total of $54,000.00 was paid by Plaintiff PRO-DRIVE to SS Design Labs.

70.     As of May 2, 2011, Defendant HIGHLAND only had two 1150cc engines.  In order to build prototypes, complete testing, and get EPA certification to produce engines in the timeframe that Defendant HIGHLAND proposed in the meetings, more engines were needed. Provost asked Defendant HIGHLAND to get more engines from Folan.  Provost was told that Defendant HIGHLAND was waiting on investors for more funding before getting more engines. In order to get the necessary engines needed to complete the work in the proposed timeframe project, Plaintiff PRO-DRIVE purchased five 1150cc engines from Folan during May and June 2011.

71.     Provost went to Tulsa on July 11, 2011 to meet with Defendant HIGHLAND and Shawd to witness a test run of the Vertical Shaft Prototype—the motor paid by Plaintiff PRO-DRIVE for SS Design Labs to convert.  Defendant HIGHLAND's new engineer, Steven Posie Phaff ("Phaff"), was in attendance.

72.     There were other people at the July 11, 2011 meeting.  Defendant HIGHLAND told Provost that these other people were potential investors.

73.     The Vertical Shaft Prototype delivered for testing was much bigger and more complicated than expected.  Defendant HIGHLAND and Shawd had been repeatedly told that the design should be similar to that of the Kohler engine on the PRO-DRIVE outboard motor that was given to them to examine.  The Vertical Shaft Prototype was complicated and appeared to be

-14-

impossible to produce in any kind of volume, and would also be very difficult to properly service.

74.    The Vertical Shaft Prototype was taken to the lake with the HIGHLAND team. The performance of the Vertical Shaft Prototype was poor during testing, and it became overheated and could not be used for further testing.

75.    The electronic control unit ("ECU") that originally came with the 1150cc Folan engine was a fire pump engine control unit and it was not designed to be used as anything else. Folan would have to cooperate in programming this ECU to have the engine perform in a different application.  Defendant HIGHLAND agreed that another ECU supplier would be needed.  Nevertheless, Defendant FITZPATRICK said that they should soon have a design freeze.

76.    Provost was alarmed by Defendant FITZPATRICK's design freeze remark as the Vertical Shaft Prototype was in no way ready for production or even taking it out on the water any distance from a boat landing.

77.    Provost expressed his concerns about the Vertical Shaft Prototype.  Defendant FITZPATRICK assured him that Defendant HIGHLAND would have everything working right before production.  Provost requested a production date and Defendant FITZPATRICK said that Defendant HIGHLAND was trying for January 2012.

78.    Provost asked Defendant FITZPATRICK for a complete story on all agreements that Defendant HIGHLAND had that pertained to the PRO-DRIVE agreement.  This included PRO-DRIVE, HIGHLAND, Highland AB, Rollox, SS Design Labs, and Folan.  Defendant FITZPATRICK told Provost of Defendant HIGHLAND's plans to go to Sweden to visit Folan, the designer and builder of the 1150cc engine.  After that, Phaff and the HIGHLAND team

would come to PRO-DRIVE in Loreauville and stay as long as needed to learn how PRO-DRIVE outboard motors operate.

79.     Defendant FITZPATRICK also agreed Defendant HIGHLAND would pay SS Design Labs to begin work on a second 1150cc vertical shaft engine conversion.

80.     HIGHLAND technicians, Phaff and Brian Driver ("Driver"), came to work at PRO-DRIVE's Loreauville, Louisiana facility on September 29, 2011.  Plaintiff PRO-DRIVE arranged lodging accommodations for Driver and Phaff in nearby New Iberia, Louisiana. Plaintiff PRO-DRIVE paid $6,000.00 per month for the technician's services.  Driver and Phaff brought the Vertical Shaft Prototype and boat.

81.     Phaff made modifications to the 1150cc engine on the Vertical Shaft Prototype developed by SS Design Lab prior to arriving at PRO-DRIVE on September 29, 2011.  These modifications included the removal of one of the two electric oil pumps and installation of a different ECU and program.

82.     The ECU and program installed by Phaff was a Mega-Squirt system which is typically used by engine hobbyists to modify engines for use automobiles and other engine platforms.  A Mega-Squirt system is typically not used in production situations.

83.     Phaff and Driver spent days on PRO-DRIVE's test pond working with the 1150cc engine on the Vertical Shaft Prototype on a boat.  Progress was very slow, and Defendant HIGHLAND's motor performed no better than the engine on the 27 HP PRO-DRIVE outboard motor.

84.     Plaintiff PRO-DRIVE had multiple meetings with Defendant HIGHLAND about the engines performance and Plaintiff PRO-DRIVE made suggestions for changes that would

enhance performance.  The suggestions included small modifications such as advancing the engine timing.  Still, Defendant HIGHLAND refused to make the suggested changes.

85.     In a meeting in Loreauville, Louisiana on November 2, 2011, Defendant HIGHLAND reluctantly agreed to try advancing the engine timing as suggested by Plaintiff PRO-DRIVE.  The improvement in performance was noticeable by all, including Defendant FITZPATRICK, Phaff, and Driver of Defendant HIGHLAND.

86.     Later in November 2011, Phaff and Driver left work at Plaintiff PRO-DRIVE's Loreauville, Louisiana facility without notice and did not return.

87.     There was no further progress on the 1150cc engine development after the HIGHLAND technicians left the PRO-DRIVE facility in November 2011.

88.     The original ECU that was on the engine when it was built in Sweden was inaccessible and the hobby shop "Mega-Squirt" system was not performing as required.

89.     In January 2012, Plaintiff PRO-DRIVE decided to take matters into its own hands and find a new ECU (or EFI) supplier.  Plaintiff PRO-DRIVE obtained a quote for an ECU system and development work and then issued a purchase order and payment to Ecotrons, a U.S. fuel injection development and supply company.

90.     Plaintiff PRO-DRIVE relayed the information received from Ecotrons to Defendant HIGHLAND.  Defendant HIGHLAND never contacted Ecotrons, and Plaintiff PRO-DRIVE was told that Defendant HIGHLAND was now working with a supplier in Sweden.

91.     Plaintiff PRO-DRIVE decided to work directly on the development of the 1150cc engine.

92.     In February 22, 2012, Plaintiff PRO-DRIVE received a second prototype 1150cc conversion by SS Design Labs ("Second Vertical Shaft Prototype") from Defendant

HIGHLAND.  Plaintiff PRO-DRIVE started the engine and oil flowed onto the exhaust pipe, and the unit caught fire.

93.     On February 28, 2012, Defendant HIGHLAND visited Plaintiff PRO-DRIVE for meetings and a demonstration of the Second Vertical Shaft Prototype.

94.     The Second Vertical Shaft Prototype was unusable as failing to operate in the required manner.

95.     Defendant HIGHLAND never provided Plaintiff PRO-DRIVE a suitable prototype for production.

96.     Defendant HIGHLAND misled Plaintiff PRO-DRIVE from the onset about Defendant HIGHLAND's ability to design and produce a production-ready vertical shaft engine.

97.     From the onset of his involvement with Defendant HIGHLAND, Defendant FITZPATRICK misled Plaintiff PRO-DRIVE about Defendant HIGHLAND's ability to design and produce a production vertical shaft engine and Defendant HIGHLAND's technical and financial wherewithal to continue the project.

98.     Defendant HIGHLAND is no longer in the motorcycle or recreational OEM business and no longer has operations in the State of Oklahoma.

99.     Defendant HIGHLAND is now in the located in Atlanta, Georgia.

**(Breach of Contract)**

100.     Plaintiff PRO-DRIVE realleges and incorporates herein the allegations contained in paragraphs 1 through 99 inclusive.

101.     Plaintiff PRO-DRIVE honored all of its commitments to Defendant HIGHLAND under the Distribution Agreement including payments in excess of $500,000.00, for which it received no return.

102.    Defendant HIGHLAND breached the Distribution Agreement by failing to produce a vertical shaft engine suitable for production and incorporation in a PRO-DRIVE outboard motor system.  Plaintiff PRO-DRIVE suffered damages in excess of $500,000.00 in direct and consequential damages resulting from Defendant HIGHLAND's breach of contract.

103.    Defendants' wrongful actions are remediable under LA C.C. art. 1994.

**(Detrimental Reliance, Bad Faith Obligor)**

104.    Plaintiff PRO-DRIVE realleges and incorporates herein the allegations contained in paragraphs 1 through 103 inclusive.

105.    Defendants HIGHLAND and FITZPATRICK represented and continually promised that Defendant HIGHLAND could and would develop an engine suitable for use in a PRO-DRIVE outboard motor system.  Plaintiff PRO-DRIVE relied on the representations of Defendants HIGHLAND and FITZPATRICK as to the ability of HIGHLAND to design, develop and manufacture the contracted-for outboard motor.  In reliance on Defendants' representations, Plaintiff PRO-DRIVE continued to pay Defendant HIGHLAND for the work that was never adequately performed or completed.

106.    Both Defendant HIGHLAND and Defendant FITZPATRICK continued to mislead Plaintiff PRO-DRIVE after the death of Malmberg and the other HIGHLAND executives promising that HIGHLAND could produce the contracted-for motors.  PRO-DRIVE relied to its detriment on these promises as suffered substantial damages.  As a result of Defendants' actions, Plaintiff PRO-DRIVE suffered damages in excess of $500,000.00.

107.    Defendants' wrongful actions are remediable under LA C.C. art. 1967.

108.    Additionally, Defendants HIGHLAND and FITZPATRICK refused to make alterations, mend, remedy, or cure the defects in the design, manufacture, and delivery of

special-type outboard motors, as well as continuously misled Plaintiff PRO-DRIVE in regard to the project status and progress, the quality of workmanship, and the materials provided.

109.    These actions and promises of Defendants HIGHLAND and FITZPATRICK caused Plaintiff PRO-DRIVE to spend a considerable amount of time and money for which no benefit was gained or received.  Continuous assurances by Defendants HIGHLAND and FITZPATRICK that a production model of a specially designed outboard motor was forthcoming induced Plaintiff PRO-DRIVE to spend substantial sums of money over the course of several years, while Defendants HIGHLAND and FITZPATRICK had no reasonable belief or intention of performing HIGHLAND's part of the agreement with Plaintiff PRO-DRIVE. The misrepresentations of Defendant HIGHLAND's technical and financial ability by Defendants HIGHLAND and FITZPATRICK were made with the intention to obtain an unjust advantage for Defendants HIGHLAND and FITZPATRICK or to cause a loss and inconvenience to Plaintiff PRO-DRIVE.

110.     Defendants HIGHLAND and FITZPATRICK intentionally misled Plaintiff PRO-DRIVE as to the design and manufacturing capabilities of Defendant HIGHLAND and as to the ability of Defendant HIGHLAND to perform and to produce an outboard motor engine suitable for the needs of Plaintiff PRO-DRIVE as agreed.

111.    Because Defendant HIGHLAND has failed to perform its duties and because the actions of  Defendants HIGHLAND and FITZPATRICK further aggravated the situation by making continued promises to cure the defects or give remedy to Plaintiff PRO-DRIVE while knowing that HIGHLAND did not have the design,  manufacturing, and production capabilities necessary for performance, the actions of Defendants HIGHLAND and FITZPATRICK were in bad faith and Defendants HIGHLAND and FITZPATRICK are liable for all the damages,

foreseeable or not, that are a direct consequence of Defendant HIGHLAND's bad faith failure to perform as contemplated by LA C.C. art. 1997.  Therefore, Plaintiff PRO-DRIVE requests that this Court grant it additional damages as against the Defendants.

112.    Plaintiff PRO-DRIVE reserves the right to notice of defect to this pleading and reserves the right to amend or supplement this Complaint after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

## DEMAND FOR JURY TRIAL

113.    Plaintiff PRO-DRIVE hereby requests a jury trial pursuant to Fed. R. Civ. P. 38.

## PRAYER

For the above reasons, Plaintiff PRO-DRIVE brings this action and respectfully requests that the Defendants be cited and made to appear herein and after trial before a jury, Plaintiff PRO-DRIVE has judgment in its favor in the following particulars:

1.    All compensable damages at law and in equity which are within the jurisdictional limits of this court;

2.    Damages for breach of contract by Defendant HIGHLAND;

3.    All the damages, foreseeable or not, that are a direct consequence of the bad faith inducement by Defendants HIGHLAND and FITZPATRICK by inducing Plaintiff PRO-DRIVE to pay and then continue to pay Defendant HIGHLAND for work that Defendants HIGHLAND and FITZPATRICK knew would not lead to performance under the contract or the delivery of an outboard motor engine suitable for production;

4.    Pre- and post-judgment interest on all amounts awarded;

5.    All costs and attorneys' fees to which Plaintiff PRO-DRIVE may be entitled; and

6.      Such other general, equitable, and just relief to which Plaintiff PRO-DRIVE may

be entitled.

Respectfully submitted,

/s./ *Thomas S. Keaty*
KEATY LAW FIRM
Thomas S. Keaty – 7666
365 Canal Street, Suite 2410
New Orleans, Louisiana 70130
(504) 524-2100
tskeaty@keatypatentfirm.com

and

/s./ Ryan Goudelocke
DURIO, McGOFFIN, STAGG &
ACKERMANN, P.C.
Ryan Goudelocke – 30525
William W. Stagg – 1613
220 Heymann Boulevard
Lafayette, Louisiana 70503
Post Office Box 51308
Lafayette, Louisiana 70505
(337) 233-0300
bill@dmsfirm.com
ryan@dmsfirm.com

*Attorneys for Plaintiff, PRO-DRIVE*
*OUTBOARDS, LLC*